THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| OLD REPUBLIC GENERAL INSURANCE COMPANY, *Plaintiff*, v. AMERISURE INSURANCE COMPANY and LIBERTY MUTUAL FIRE INSURANCE COMPANY, *Defendants*. | No. 20 C 992 Judge Virginia M. Kendall |

**MEMORANDUM OPINION AND ORDER**

Tanger Grand Rapids, LLC hired Rockford Construction Co., a general contractor, to build an outlet mall. After the pavement in the parking lot failed, Tanger sued Rockford for breach of contract in the Western District of Michigan. Rockford is an additional insured on the commercial general liability policies of the subcontractors who built the faulty pavement. Liberty Mutual Fire Insurance Company, one subcontractor's insurer, agreed to defend Rockford in the underlying action. But Amerisure Insurance Company, who insured the other subcontractor, refused. In their Crossclaims, Amerisure and Liberty Mutual request opposite declarations as to Amerisure's duty to defend Rockford. Amerisure and Liberty Mutual now cross-move for summary judgment. (Dkts. 103, 107). For the following reasons, Amerisure's motion [103] is granted, and Liberty Mutual's motion [107] is denied.

**BACKGROUND**

A.   The Construction Project

In 2014, Tanger Grand Rapids, LLC contracted with Rockford Construction Co., a general contractor, to build the Tanger Outlet Center in Byron Township, Michigan (the "Tanger

1

Contract"). (Dkt. 114 ¶ 1; Dkts. 105, 105-1). Rockford subcontracted with Kamminga & Roodvoets, Inc. (K&R) to work on the pavement for the outlet mall. (Dkt. 114 ¶ 2; Dkt. 105-2). Under the K&R Subcontract, K&R agreed to provide excavation work, including: "site clearing, earthwork, site utilities, fine grade, demolition, . . . fencing, asphalt paving, flatwork & curbs/gutters, retaining walls, site electrical, traffic signal, landscape/plants/seeding/turf and grasses, and irrigation." (Dkt. 114 ¶ 3; Dkt. 105-2 at 7). The K&R Subcontract required K&R to maintain primary commercial general liability (CGL) insurance for itself, with Rockford as an additional insured. (Dkt. 114 ¶¶ 4–5; Dkt. 105-2 at 4–5, 30–31). For additional paving work, Rockford subcontracted with Michigan Paving & Materials, CP. (Dkt. 114 ¶ 6; Dkt. 105-3). The Michigan Paving Subcontract also required Michigan Paving to maintain primary CGL insurance, with Rockford as an additional insured. (Dkt. 114 ¶ 7; Dkt. 122 ¶ 53; Dkt. 105-3 at 4).

B.  The Insurance Policies

  1.  The Amerisure Policy

K&R's CGL policy from Amerisure, which was effective for one year starting April 1, 2015, provides:

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies. We will have the right and duty to defend the insured against any "suit" seeking those damages. However, we will have no duty to defend the insured against any "suit" seeking damages for "bodily injury" or "property damage" to which this insurance does not apply. . . .
>
> This insurance applies to "bodily injury" and "property damage" only if:
> (1) The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory"; [and]
> (2) The "bodily injury" or "property damage" occurs during the policy period . . . .

(Dkt. 114 ¶ 32, 39; Dkt. 105-7 at 94). An "occurrence," under the policy, "means an accident, including continuous or repeated exposure to substantially the same general harmful conditions."

2

(Dkt. 114 ¶ 40; Dkt. 105-7 at 108). And "property damage" means "[p]hysical injury to tangible property, including all resulting loss of use of that property," or "[l]oss of use of tangible property that is not physically injured." (Dkt. 114 ¶ 41; Dkt. 105-7 at 108).

Rockford was an additional insured under the Amerisure Policy. (*See* Dkt. 114 ¶¶ 34–36; Dkt. 105-7 at 94, 122). According to the policy's "professional-services" exclusion, additional-insured coverage does not reach:

> "property damage" . . . arising out of an . . . engineer's, or surveyor's rendering of, or failure to render, any professional services, including but not limited to:
> (1) The preparing approving, or failing to prepare or approve: . . .
> (f) Change orders;
> (g) Design specifications; and
> (2) Supervisory, inspection, or engineering services.

(Dkt. 114 ¶ 37; Dkt. 105-7 at 123).

### 2. The Liberty Mutual Policy

Michigan Paving's parent company obtained a CGL policy from Liberty Mutual, which was effective for one year beginning on September 1, 2015. (Dkt. 114 ¶ 42; Dkt. 116 ¶ 8; Dkts. 105-8, 105-9, 105-10, 105-11, 105-12, 105-13, 105-14, 105-15, 105-16, 105-17). Rockford was an additional insured under the Liberty Mutual Policy. (*See* Dkt. 122 ¶ 55; Dkt. 105-14).

### C. The Underlying Action

In September 2018, Tanger sued Rockford, Nederveld, Inc., and Material Testing Consultants, Inc. (MTC) in the United States District Court for the Western District of Michigan. (Dkt. 114 ¶ 8; Dkt. 105-4); Complaint, *Tanger Grand Rapids, LLC v. Nederveld, Inc.*, No. 1:18-cv-01125 (W.D. Mich. Sept. 27, 2018), ECF. No. 1. Two months later, Rockford tendered the underlying action to Amerisure as an additional insured. (Dkt. 114 ¶ 43; Dkt. 1-9). Yet, in a March 2019 letter, Amerisure refused to defend Rockford in the action. (Dkt. 114 ¶ 44; Dkt. 1-10).

In May 2019, Tanger amended its complaint to add K&R and Michigan Paving as third-party defendants. (Dkt. 114 ¶ 9; Dkts. 105-5, 105-6); First Amended Complaint, *Tanger*, No. 1:18-cv-1125, ECF No. 55. In the amended complaint, Tanger brought breach-of-contract claims against Rockford, Nederveld, and MTC. (Dkt. 114 ¶¶ 10–12; Dkt. 105-5 ¶¶ 11–32, 39–65). Tanger alleged that "Rockford agreed to provide general contractor services" for the outlet mall. (Dkt. 114 ¶ 12; Dkt. 105-5 ¶ 17). Per the Tanger Contract, Rockford's "Work" was to include "the construction and services required by the Contract Documents, including all labor and materials constituting the whole or part of the Project"—with "Project" "defined as the total construction of which the Work is performed under the Contract Documents." (Dkt. 114 ¶ 13; Dkt. 105-5 ¶¶ 18–19). Tanger alleged that it retained Nederveld and MTC for engineering services relating to the pavement design and construction. (Dkt. 114 ¶¶ 10–11; Dkt. 105-5 ¶¶ 11–15, 28–32, 39–46, 58–65; *see also* Dkt. 105-5 at 15–34; Dkt. 105-6 at 50–72).

Around January 2016, Tanger's amended complaint alleged, "the Project pavement was observed to be cracking, deforming (aka 'scalloping' and/or 'tenting'), and otherwise failing." (Dkt. 114 ¶ 16; Dkt. 105-5 ¶ 33). "[T]he aggregate base and sand subbase materials used in the pavement structure generally did not meet the design specifications," which "caused subsurface water to be held and, when subjected to the freeze-thaw cycle, resulted in the pavement failure." (Dkt. 114 ¶ 17; Dkt. 105-5 ¶¶ 34–35). The pavement failure allegedly resulted from "acts and/or omissions of Nederveld, Rockford, and/or MTC," and required "significant remediation work." (Dkt. 114 ¶ 18; Dkt. 105-5 ¶¶ 37–38).

As to Rockford, Tanger alleged that it had breached the Tanger Contract by:

- "failing to adequately provide general contractor services";
- "providing improper materials";

4

- "fail[ing] to perform the Work conforming to the requirements of the Contract Documents";

- "fail[ing] to perform the Work free from defects";

- "fail[ing] to correct defects promptly after receipt of written notice"; and

- "approving [a change order], which substituted 22A gravel for 21AA gravel."[1]

(Dkt. 114 ¶¶ 19–20; Dkt. 105-5 ¶¶ 50–55).

In the breach-of-contract claims against Nederveld and MTC, Tanger alleged the engineers provided inadequate engineering services, including by approving the gravel change order. (Dkt. 114 ¶¶ 24–26; Dkt. 105-5 ¶¶ 43–45, 62–63). Tanger's amended complaint also brought a negligence claim, alleging the "Defendants and/or Third-Party Defendants breached their duty to Tanger by failing to design and/or construct the pavement in conformity with industry standards and in a manner demonstrating adequate professional skill and judgment." (Dkt. 114 ¶ 28; Dkt. 105-5 ¶ 68). Plus, "Rockford, MTC and/or Nederveld breached their duty to Tanger by negligently approving" the change order. (Dkt. 114 ¶ 29; Dkt. 105-5 ¶ 69). K&R and Michigan Pavement, Tanger alleged, "fail[ed] to provide Work in compliance with applicable industry standards." (Dkt. 114 ¶ 30; Dkt. 105-5 ¶¶ 70–71). Tanger allegedly incurred damages "[a]s a direct and proximate result of Defendants' and/or Third-Party Defendants' failure to adequately design and/or construct the pavement in conformity with industry standards and in a manner demonstrating adequate professional skill and judgment." (Dkt. 114 ¶ 30; Dkt. 105-5 ¶ 72). Finally, Tanger's amended complaint brought an unjust-enrichment claim against the defendants and third-party defendants, incorporating the preceding allegations. (Dkt. 114 ¶ 31; Dkt. 105-5 ¶¶ 73–75).

---

[1] Tanger attached a copy of the change order to its amended complaint, along with MTC's related report, analyzing a 22A gravel sample and concluding that the "Sample Met Specification Requirements. (Dkt. 114 ¶¶ 20, 23; Dkt. 105-6 at 76, 78).

In October 2020, Liberty Mutual agreed to defend Rockford in the underlying action, "subject to a full and complete reservation of rights under the Liberty Mutual Policy." (Dkt. 116 ¶ 9; Dkt. 108-3; *see also* Dkt. 63 ¶ 2). In March 2023, the Michigan district court granted Rockford's motion for summary judgment and denied Tanger's partial cross-motion for summary judgment against Rockford—a ruling which is pending appeal. (Dkt. 134-1); *Tanger*, No. 1:18-cv-01225, 2023 WL 3000428, *appeal docketed*, No. 23-1349 (6th Cir. Apr. 18, 2023). As to the breach-of-contract claim, the court found that "Rockford complied with the specifications, design requirements, and mandates in the [Tanger] Contract." *Tanger*, 2023 WL 3000428, at *5. The court also noted that Tanger's negligence and unjust-enrichment claims against Rockford had already been dismissed but would fail as a matter of law regardless. *Id.* at *2 n.3; *see also* Transcript of Pre-Motion Conference at 10:6–17, *Tanger*, No. 1:18-cv-01225, ECF No. 396.

D.   **The Present Action**

In February 2020, Old Republic General Insurance Company, Rockford's insurer, filed its Complaint in this action, seeking a declaration that Amerisure and Liberty Mutual owed a duty to defend and indemnify Rockford as an additional insured under their respective policies. (Dkts. 1, 46). Amerisure filed a Counterclaim against Old Republic, seeking a declaration that it had no duty to defend Rockford. (Dkt. 48). In February 2021, Old Republic and Rockford assigned to Liberty Mutual their claims against Amerisure. (Dkt. 116 ¶¶ 10–11; Dkts. 108-4, 108-5).

Then, Liberty Mutual filed a Crossclaim against Amerisure, seeking a declaratory judgment (Count I), equitable subrogation (Count II), or in the alternative to Count II, equitable contribution (Count III). (Dkt. 63 ¶¶ 23–39). Amerisure responded with a Crossclaim against Liberty Mutual, seeking a contrary declaratory judgment. (Dkt. 70). Old Republic then dismissed its claims in this action, and Amerisure dismissed its Counterclaim against Old Republic. (Dkt.

6

84). Amerisure's and Liberty Mutual's Crossclaims remained. (*Id.*) On those Crossclaims, Amerisure and Liberty Mutual now cross-move for summary judgment. (Dkts. 103, 107).

## LEGAL STANDARD

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). On cross-motions for summary judgment, the Court "construe[s] all facts and inferences in favor of the party against whom the motion under consideration is made." *Markel Ins. Co. v. Rau*, 943 F.3d 1012, 1016 (7th Cir. 2020). The Court does not "weigh conflicting evidence, resolve swearing contests, determine credibility, or ponder which party's version of the facts is most likely to be true." *Stewart v. Wexford Health Sources, Inc.*, 14 F.4th 757, 760 (7th Cir. 2021). A genuine issue of material fact exists when "there is sufficient evidence" for a jury to return a verdict in favor of the party opposing summary judgment. *Birch|Rea Partners, Inc. v. Regent Bank*, 27 F.4th 1245, 1249 (7th Cir. 2022) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986)).

## DISCUSSION

In Count I of Liberty Mutual's Crossclaim, it seeks a declaratory judgment that Amerisure has a duty to defend and indemnify Rockford in the underlying *Tanger* action. (Dkt. 63 ¶¶ 23–27). In Counts II and III, which depend on the success of Count I, Liberty Mutual seeks equitable subrogation, or in the alternative, equitable contribution for its costs in defending Rockford. (*Id.* at ¶¶ 28–32). In Amerisure's Crossclaim, it seeks a declaration that it neither owes Rockford a duty to defend nor owes Liberty Mutual its costs in defending Rockford. (Dkt. 70 at 27). In their cross-motions for summary judgment, the cross-claimants first dispute whether Michigan or Illinois law should apply. (Dkt. 106 at 3–4; Dkt. 107 at 5–6). The answer to that first question, it turns out, resolves the second: whether the underlying complaint potentially alleges "property

damage" resulting from an "occurrence"—triggering Amerisure's duty to defend. (*See* Dkt. 106 at 5–10; Dkt. 107 at 6–10). Since Illinois law applies, and Amerisure owes no duty to defend Rockford, the Court need not reach the cross-claimants' remaining arguments.[2]

I.      **Choice of Law**

Federal courts sitting in diversity interpret insurance policies under state law. *Nat'l Am. Ins. Co. v. Artisan & Truckers Cas. Co.*, 796 F.3d 717, 723 (7th Cir. 2015). In deciding which state's law to apply, courts "look to the choice-of-law rules of the forum state"—here, Illinois. *Paulsen v. Abbott Lab'ys*, 39 F.4th 473, 477 (7th Cir. 2022) (quoting *Sosa v. Onfido, Inc.*, 8 F.4th 631, 637 (7th Cir. 2021)). According to Illinois choice-of-law principles, "the law of the state with the 'most significant relationship to the occurrence and the parties' applies in the event of a conflict." *Bd. of Forensic Document Examiners, Inc. v. Am. Bar Ass'n*, 922 F.3d 827, 831 (7th Cir. 2019) (quoting *Barbara's Sales, Inc. v. Intel Corp.*, 879 N.E.2d 910, 920 (Ill. 2007)); *see also Auto-Owners Ins. Co. v. Websolv Computing, Inc.*, 580 F.3d 543, 547 (7th Cir. 2009) (discussing relevant factors in insurance cases). Yet, forum law applies "unless an actual conflict with another state's law is shown, or the parties agree that forum law does not apply." *Paulsen*, 39 F.4th at 477 (quoting *Gunn v. Cont'l Cas. Co.*, 968 F.3d 802, 808 (7th Cir. 2020)). In other words, "[a] choice-of-law determination is required only when a difference in law will make a difference in the outcome." *Sosa*, 8 F.4th at 637 (quoting *Bridgeview Health Care Ctr., Ltd. v. State Farm Fire & Cas. Co.*, 10 N.E.3d 902, 905 (Ill. 2014)). Presenting "a mere possibility of a conflict of laws" does not suffice. *Bridgeview*, 10 N.E.3d at 909.

---

[2] Even if the underlying allegations implicated "property damage" or an "occurrence" under the Amerisure Policy, Amerisure argues that its policy's professional-services exclusion bars coverage. (Dkt. 115 at 7–10; Dkt. 113 at 12–16). And if Amerisure owed a duty to defend Rockford in the underlying action, the cross-claimants dispute the extent of Amerisure's potential coverage—Liberty Mutual seeking complete reimbursement for defending Rockford, (Dkt. 123 at 5–7), while Amerisure contends that it would be on the hook for no more than one-third of Rockford's defense costs. (Dkt. 113 at 10–15).

Here, the cross-claimants agree that Michigan has the most significant contacts to this case. (Dkt. 113 at 10–11; Dkt. 115 at 3). Liberty Mutual argues that there is an actual conflict because Amerisure would have a duty to defend Rockford under Michigan law, but not Illinois law. (Dkt. 113 at 6–10). Amerisure disagrees that the outcome hinges on the choice of law, urging the Court to stick with Illinois law. (Dkt. 115 at 3). As "[t]he party seeking the choice-of-law determination," Liberty Mutual "bears the burden of demonstrating a conflict." *Id.* (quoting *Bridgeview*, 10 N.E.3d at 905). It fails to carry that burden.

Under Illinois law, as Liberty Mutual points out, standard CGL policies do not cover "damage to the construction project *itself* because of a construction defect"—only damage to "something *other* than the project." *Lagestee-Mulder, Inc. v. Consolidated Ins. Co.*, 682 F.3d 1054, 1057 (7th Cir. 2012) (citing *Lyerla v. AMCO Ins. Co.*, 536 F.3d 684, 688 (7th Cir. 2008)); *Travelers Ins. Co. v. Eljer Mfg., Inc.*, 757 N.E.2d 481, 503 (Ill. 2001) ("[CGL] policies . . . are intended to protect the insured from liability for injury or damage to the persons or property of others; they are not intended to pay the costs associated with repairing or replacing the insured's defective work and products, which are purely economic losses." (quoting *Qualls v. Country Mut. Ins. Co.*, 462 N.E.2d 1288, 1291 (Ill. App. Ct. 1984))). "Illinois courts have reasoned that damage to a construction project resulting from construction defects is not an 'accident' or 'occurrence' because it represents the natural and ordinary consequence of faulty construction." *Lyerla*, 536 F.3d at 689 & n.2 (noting that "[t]here is considerable disagreement among the states as to whether defective work can constitute an 'occurrence' under a standard CGL policy" (collecting cases)). Nor does Illinois law consider "[t]he cost of repairing or replacing defective work" to be "property damage." *Id.* at 692 (citing *Viking Constr. Mgmt., Inc. v. Liberty Mut. Ins. Co.*, 831 N.E.2d 1, 17 (Ill. App. Ct. 2005), *State Farm Fire & Cas. Co. v. Tillerson*, 777 N.E.2d 986,

9

991 (Ill. App. Ct. 2002), and *Diamond State Ins. Co. v. Chester-Jensen Co.*, 611 N.E.2d 1083, 1089 (Ill. App. Ct. 1993)); *see also Eljer*, 757 N.E.2d at 502 ("[T]he diminution in value of a whole, resulting from the failure of a component part to perform as promised, does not constitute a *physical* injury.").

Attempting to demonstrate a conflict, Liberty Mutual relies solely on the Michigan Supreme Court's decision in *Skanska USA Building Inc. v. M.A.P. Mechanical Contractors, Inc.*, 952 N.W.2d 402 (Mich. 2020). There, a renovation project's construction manager brought on a subcontractor to install heating and cooling. *Id.* at 404. The subcontractor installed some expansion joints backwards, causing "[s]ignificant damage to concrete, steel, and the heating system." *Id.* That damage "may have gone beyond the scope of the work" under the construction manager's contract. *Id.* at 405–06. The construction manager then sought coverage as an additional insured under the subcontractor's Amerisure CGL policy. *Id.* at 404.

Michigan's highest court had to decide whether the subcontractor's faulty installation was an "accident," and therefore, an "occurrence" under the policy. *Id.* at 407.[3] It held: "faulty subcontractor work that was unintended by the insured may constitute an 'accident' (and thus an 'occurrence') under a CGL policy." *Skanska*, 952 N.W.2d at 411. Acknowledging that other courts have held that defective workmanship is not "property damage," the state supreme court "express[ed] no opinion regarding these approaches because they were not raised by the parties and do not have any direct impact on how we define 'accident.'" *Id.* at 410 n.15 (collecting cases).

---

[3] As in this case, the subcontractor's policy defined "occurrence" as "an accident, including continuous or repeated exposure to substantially the same general harmful conditions." *Id.* According to Michigan law, an "accident" is "an undefined contingency, a casualty, a happening by chance, something out of the usual course of things, unusual, fortuitous, not anticipated, and not naturally to be expected." *Id.* (quoting *Allstate Ins. Co. v. McCarn*, 645 N.W.2d 20, 22–23 (Mich. 2002)); *cf. Lyerla*, 536 F.3d at 688–89 ("Illinois courts construing insurance policies have defined 'accident' as 'an unforeseen occurrence, usually of an untoward or disastrous character or an undesigned, sudden, or unexpected event of an inflictive or unfortunate character." (quoting *Westfield Nat'l Ins. Co. v. Cont'l Cmty. Bank & Tr. Co.*, 804 N.E.2d 601, 605 (Ill. App. Ct. 2003))). So far, no conflict.

Rather, the court ruled "simply that faulty subcontractor work *may* constitute an 'accident,'" leaving "any determination regarding the extent to which the damages to the work product are covered under the policy to the lower courts." *Id.*

The holding in *Skanska* may be out of step with Illinois law's understanding of "occurrence." *See Lyerla*, 536 F.3d at 689–92 (collecting cases). Also in apparent tension with Illinois law is the Michigan Supreme Court's reasoning that an "accident' could "include damage limited to the insured's own work product." *Compare Skanska*, 952 N.W.2d at 410–11, *with Eljer*, 757 N.E.2d at 503. But that interpretive tension does not rise to the level of an actual, outcome-determinative conflict. Reinforcing that conclusion is an important factual distinction between this case and *Skanska*: there, unlike here, the subcontractor's faulty work may have caused damage beyond the scope of the construction manager's project. *See Skanska*, 952 N.W.2d at 405–06, 413 n.23. Moreover, the *Skanska* court's holding was narrow—reaching no further than the meaning of "occurrence." *See id.* at 407–11.

*Skanska* does not show that a claim against a general contractor for the costs of repairing a subcontractor's faulty workmanship on the general contractor's project implicates "property damage," as Michigan law understands that phrase in CGL policies. Nor has Liberty Mutual drawn this Court's attention to any Michigan court's interpretation of "property damage"—before *Skanska* or since—that clashes with Illinois law. *Cf. Bridgeview*, 10 N.E.3d at 908 (observing that lower-court decisions of another state may reflect that state's law, but federal courts' predictions of state law pursuant to *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 (1938), without more, do not); *see also Moscov v. Mut. Life Ins. Co. of N.Y.*, 56 N.E.2d 399, 404–05 (Ill. 1944). In the absence of any Michigan state-court decision showing that Michigan law would require Amerisure to defend

11

Rockford in the underlying action at issue here, Liberty Mutual has shown nothing more than the "mere possibility of a conflict." *See Bridgeview*, 10 N.E.3d at 909. So Illinois law applies.

**II. Duty to Defend**

To determine whether an insurer has a duty to defend under Illinois law, the Court compares the language in the insurance policy with the allegations in the underlying complaint. *Lagestee*, 682 F.3d at 1056 (citing *Gen. Agents Ins. Co. of Am., Inc. v. Midwest Sporting Goods Co.*, 828 N.E.2d 1092, 1098 (Ill. 2005)). "If the underlying complaint alleges facts within or potentially within policy coverage, an insurer is obligated to defend its insured even if the allegations are groundless, false or fraudulent." *Id.* (quoting *Gen. Agents*, 828 N.E.2d at 1098). But the insurer has no duty to defend if the plaintiff in the underlying action could not "prove the insured liable, under any theory supported by the complaint, without also proving facts that show the loss falls outside of the insurance policy." *Farmers Auto. Ins. Ass'n v. Danner*, 967 N.E.2d 836, 842 (Ill. App. Ct. 2012) (quoting *Am. Econ. Ins. Co. v. Holabird & Root*, 886 N.E.2d 1166, 1171 (Ill. App. Ct. 2008)); *accord Lexington Ins. Co. v. Chi. Flameproof & Wood Specialties Corp.*, 950 F.3d 976, 980 (7th Cir. 2020) (explaining that an insurer may refuse to defend its insured where it is "clear from the face of the underlying complaint" that the allegations are beyond the policy's scope (quoting *Westfield Ins. Co. v. Nat'l Decorating Serv., Inc.*, 863 F.3d 690, 695 (7th Cir. 2017)).

Recall that the Amerisure Policy covers only "bodily injury" or "property damage" resulting from an "occurrence." (Dkt. 105-7 at 94). Liberty Mutual concedes that Tanger's amended complaint in the underlying action does not suggest an "occurrence" under Illinois law. (Dkt. 113 at 9–10); *see, e.g.*, *Lyerla*, 536 F.3d at 689. The underlying complaint does not implicate "property damage" either. "Property damage" means "[p]hysical injury to tangible property,

12

including all resulting loss of use of that property." (*Id.* at 108). The "plain and ordinary meaning [of] 'physical injury' unambiguously connotes damage to tangible property causing an alteration in appearance, shape, color or in other material dimension." *Eljer*, 757 N.E.2d at 502. "[W]hen an insured causes damage to things other than its own work or product," the resulting costs are "property damage." *Federated Mut. Ins. Co. v. Coyle Mech. Supply Inc.*, 983 F.3d 307, 317 (7th Cir. 2020) (quoting *Travelers Ins. Cos. v. Penda Corp.*, 974 F.2d 823, 832 (7th Cir. 1992)).

Yet, property damage "does not include intangible damage to property, such as economic loss." *Eljer*, 757 N.E.2d at 502. And the "costs associated with repairing or replacing the insured's defective work and products . . . are purely economic losses." *Federated*, 983 F.3d at 317 (quoting *Eljer*, 757 N.E.2d at 503); *accord Viking*, 831 N.E.2d at 16–17. "That is because, when an insured causes physical injury to the underlying plaintiff's property—and not just its own faulty work product—the underlying plaintiff may seek to recover costs that go beyond the economic losses associated with repairing or replacing the insured's faulty work product." *Federated*, 938 F.3d at 317 (citing *Acuity Ins. Co. v. 950 W. Huron Condo. Ass'n*, 138 N.E.3d 189, 196 (Ill. App. Ct. 2019)).

Here, Tanger's amended complaint in the underlying action did not allege that Rockford's defective work (or that of its subcontractors) caused any damage to property beyond the scope of the Tanger Contract. Instead, Tanger alleged only that the pavement failed. (*See* Dkt. 105-5 ¶ 33 ("[T]he Project pavement was observed to be cracking, deforming (aka 'scalloping' and/or 'tenting'), and otherwise failing.")). And that pavement was within the scope of Rockford's work as the general contractor for the outlet mall. (Dkt. 105-5 ¶¶ 17–19). Nor did Tanger seek any damages from Rockford apart from the costs of repairing the pavement. (*See id.* at ¶ 38 (alleging, "[a]s a result of the acts and/or omissions of . . . Rockford, . . . the pavement requires significant

remediation work")). The costs of repairing Rockford's faulty pavement construction are economic losses, not "property damage." *See Federated*, 983 F.3d at 317.

Liberty Mutual suggests that Tanger's amended complaint implicates "property damage" by alleging that the defective work of K&R, Rockford's subcontractor and the named insured, harmed the pavement project as a whole, including the work of Rockford's other subcontractor, Michigan Paving. (Dkt. 113 at 12; Dkt. 123 at 3). This idea runs into a framing problem. A subcontractor's "property damage" is not necessarily "property damage" from the general contractor's point of view. *Cf. Acuity Ins. Co.*, 138 N.E.3d at 199 ("[W]hen an underlying complaint alleges that a subcontractor's negligence caused something to occur to a part of the construction project outside of the subcontractor's scope of work, this alleges an occurrence under this CGL policy language, notwithstanding that it would not be an occurrence from a general contractor or developer's perspective.").

There is no question that the entirety of the pavement project was within the scope of Rockford's work under the Tanger Contract. So even if the underlying allegations may have suggested pavement failure beyond the scope of K&R's work, that would not trigger Amerisure's duty to defend Rockford. *Compare Viking*, 831 N.E.2d at 3, 16–18 (holding that damage to an insured construction manager's project, resulting from a subcontractor's defective work, was not "property damage"), *with Nat'l Decorating*, 863 F.3d at 698 (ruling that an insurer had a duty to defend its insured subcontractor whose faulty work damaged other parts of a construction project—beyond the scope of the subcontractor's work).

At bottom, the underlying complaint seeks only the costs of repairing Rockford's defective work, so it alleges neither an "occurrence" nor "property damage." Amerisure has no duty to

14

defend Rockford in the underlying action.[4] Accordingly, Liberty Mutual's claims for equitable subrogation and equitable contribution—both of which presuppose at least potential coverage under the Amerisure Policy—also fail. *See Home Ins. Co. v. Cincinnati Ins. Co.*, 821 N.E.2d 269, 276 (Ill. 2004).

## CONCLUSION

For the reasons above, Amerisure's motion for summary judgment [103] is granted. Liberty Mutual's motion [107] is denied.

_____
Virginia M. Kendall
United States District Judge

Date: September 25, 2023

---

[4] Liberty Mutual's Crossclaim also seeks a declaration that Amerisure has a duty to indemnify Rockford, (Dkt. 63 ¶¶ 23–27), although Liberty Mutual has not pressed the issue in its motion for summary judgment, (Dkt. 107 at 16). For clarity, the Court notes that Amerisure has no duty to indemnify Rockford in the underlying action, since "an insurer's duty to defend is broader than its duty to indemnify." *See Federated*, 983 F.3d at 314 (quoting *Scottsdale Ins. Co. v. Columbia Ins. Grp., Inc.*, 972 F.3d 915, 919 (7th Cir. 2020)).

15